UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> v. <br><br> JARED HUNTER ADAMS, <br><br> Defendant. | No. 21-cr-212-ZMF |

**MEMORANDUM OPINION AND ORDER**

Courts must be especially vigilant in protecting indigent defendants' right to a fair trial. This includes the provision of travel, shelter, and food during trial.

Due process demands it.

The Criminal Justice Act ("CJA") requires it.

And basic human decency asks how anyone could object to it.

**I.   BACKGROUND**

On December 6, 2024, Mr. Adams failed to appear for his pretrial conference. Mr. Adams's attorney, Stephen Brennwald, informed the Court that Mr. Adams was on a flight from Ohio to Washington D.C. Mr. Brennwald explained this was the only flight that Mr. Adams could afford. Mr. Adams was living in poverty.[1] He was sleeping in his car and finding gig work where he could. Mr. Adams had spent the bulk of his savings on a suit for trial.

On December 8, 2024, the Court asked Mr. Brennwald for an update on Mr. Adams's status, including where Mr. Adams would be residing during trial. Mr. Brennwald informed the Court that Mr. Adams spent $150 the prior night to stay at a motel approximately an hour away in

---

[1] The vast majority of criminal defendants are indigent. *See* Eve Brensike Primus, 3 REFORMING CRIMINAL JUSTICE: PRETRIAL AND TRIAL PROCESSES 121 (Erik Luna ed., 2017).

Maryland. Mr. Brennwald explained that the travel time to/from the motel was interfering with trial preparation.

After the one-night hotel expense, Mr. Adams's net worth was $170. Mr. Adams had to set aside much of the $170 to purchase a bus ticket back to Ohio following trial. As such, he had no money for a hotel or food during the week he was to stand trial.

On December 9, 2024, prior to jury selection, the Court asked for updates on Mr. Adams's access to food and shelter. Mr. Adams had planned to sleep on a park bench during the week-long trial—which was taking place in winter. But Mr. Brennwald refused to leave his client literally out in the cold. Mr. Brennwald offered to assume the cost of housing Mr. Adams at a nearby hotel for two nights, totaling $420. Mr. Brennwald subsequently found a friend to provide free lodging for Mr. Adams.

Much to this Court's chagrin, much of Mr. Brennwald's and Mr. Adams's time and energy immediately prior to trial was spent discussing survival strategies rather than legal defense strategies. To remedy this, the Court ordered Mr. Brennwald to provide travel, housing, and food for Mr. Adams. The Court ordered the reimbursement of reasonable costs for those expenses using CJA funds. *See* Pub. L. No. 88-455, 78 Stat. 552 (1964) (codified at 18 U.S.C. § 3006A).[2] This decision memorializes the basis for that ruling.

## II.    DISCUSSION

"Few interests under the Constitution are more fundamental than the right to a fair trial." *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1031 (1991). Courts must "be alert to factors that may undermine the fairness of [trial]." *Estelle v. Williams*, 425 U.S. 501, 503 (1976). Courts rely

---

[2] *See* 18 U.S.C. § 3006A (allowing for reimbursement of costs already incurred).

"on reason, principle, and *common human experience* . . . to evaluate [if] the likely effects of a particular procedure" will impact the right to a fair trial. *Id.* at 504 (emphasis added).

    A.    <u>Impact of Homelessness and Hunger</u>

Hunger is a "common human experience." *Estelle*, 425 U.S. at 504. Experience and empirical evidence establish the harm of hunger: hungry people report greater negative emotions such as stress and hate, and "tend to be more impulsive, punitive, and aggressive." *See* Jennifer K. MacCormack and Kristen A. Lindquist, *Feeling Hangry? When Hunger is Conceptualized as Emotion*, EMOTION 19, 301–19 (2019), available at https://perma.cc/RU34-66FG (last accessed Sept. 22, 2025); *see also* Rozita H. Anderberg et al., *The Stomach-Derived Hormone Ghrelin Increases Impulsive Behavior*, NEUROPSYCHOPHARMACOLOGY 41, 1199–1209 (2016), available at https://perma.cc/5FT9-LN6P (last accessed Sept. 22, 2025). Hunger "has also been known to impact cognitive function and mental health." Eduardo T. Portela-Parra and Cindy W. Leung, *Food Insecurity is Associated with Lower Cognitive Functioning in a National Sample of Older Adults*, J. NUTRITION 149, 1813 (2019), available at https://perma.cc/9K5P-286Z (last accessed Sept. 22, 2025); *see also* Katie Adolphus et al., *The Effects of Breakfast and Breakfast Composition on Cognition in Children and Adolescents: A Systematic Review*, ADVANCES IN NUTRITION 590S, 593S (2016), available at https://perma.cc/M73U-T8FJ (last accessed Sept. 23, 2025) (finding that missing breakfast negatively impacts attention and memory).

Modern legal systems recognize the devastating effects of hunger. For example, infliction of starvation violates civilians' inherent human rights. *See* Rome Statute of the International Criminal Court art. 8(2)(b)(xxv). And hunger can undermine a defendant's Fifth Amendment rights. *See, e.g.*, *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (noting that "deprivation of food or sleep" can render a confession involuntarily); *Gill v. Martel*, No. 2:09-cv-748, 2011 WL

3

2038712, at *17 (E.D. Cal. May 24, 2011) (holding that hunger and fatigue contributed to a suspect's involuntary *Miranda* waiver).

Homelessness is also a common human experience. "[H]omelessness can now be found just about everywhere in the United States." Heather Rim, *Seeing the True Face of Homelessness*, *in* RELEVANCE REPORT 2020, 70 (2020), available at https://perma.cc/4CTD-CZHB (last accessed Sept. 22, 2025). Experience and empirical evidence establish the harm of homelessness: "Without a door to lock, people without housing are vulnerable" to violent crime. Margot Kushel, *Violence Against People Who Are Homeless: The Hidden Epidemic*, BENIOFF HOMELESSNESS AND HOUSING INITIATIVE (2022), available at https://perma.cc/5BY9-YCKK (last accessed Sept. 22, 2025) (noting that a 2003 study found "one-quarter of [homeless men] . . . experienced physical or sexual assault"). People who lack access to housing are vulnerable during winter to hypothermia and summer to heat stroke, both of which can lead to deadly health outcomes. *See* Jerzy Romaszko et al., *Mortality among the homeless: Causes and meteorological relationships*, PLOS ONE 12, 1 (Dec. 21, 2017), available at https://perma.cc/BB47-C28J (last accessed Sept. 23, 2025). And homeless people "are not perceived as fully human . . . [they] are seen as neither competent nor warm, . . . elicit[ing] the worst kind of prejudice—disgust and contempt." Melissa Johnstone et al., *Discrimination and well-being amongst the homeless: the role of multiple group membership*, FRONT PSYCHOL. 6, 2 (2015), available at https://perma.cc/MK4D-U6PB (last accessed Sept. 23, 2025). On the flip side, access to personal hygiene and sanitation facilities "is well known to reduce risk of infectious disease and improve mental health." Jessica H. Leibler et al., *Personal Hygiene Practices among Urban Homeless Persons in Boston, MA*, INT'L J. ENV'TAL RSCH. AND PUB. HEALTH 14, 928 (2017), available at https://perma.cc/9ZGL-HHYT (last accessed Sept. 23, 2025).

B.   Indigent Defendants' Constitutional Right to a Fair Trial

"[M]ere access to the courthouse doors does not by itself assure a [fair trial]." *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985). Due process requires proceedings "'be free of unreasoned distinctions' . . . and that indigents have an adequate opportunity to present their claims fairly within the adversary system."[3] *See Ross v. Moffitt*, 417 U.S. 600, 612 (1974) (quoting *Rinaldi v. Yeager*, 384 U.S. 305, 310 (1966)). Allowing for a two-tiered system based on wealth would eviscerate "the integrity of the criminal justice process." *United States v. Trump*, 88 F.4th 990, 1003 (D.C. Cir. 2023). "[C]ourts must take steps to [prevent this]." *Id.*

Specifically, "a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense." *Ake*, 470 U.S. at 77 (raw materials needed for defense included expert witness, for which the court paid). Thus, "[courts] have focused on identifying the 'basic tools of an adequate defense or appeal,' and [] have required that such tools be provided to those defendants who cannot afford to pay for them." *Id.* (quoting *Britt v. North Carolina*, 404 U.S. 226, 227 (1971). Examples of "basic tools" that courts must provide indigent defendants for free include:

- trial transcripts and court records, *see Griffin v. Illinois*, 351 U.S. 12, 18–19 (1956);
- filing of a notice of appeal of conviction, *see Burns v. Ohio*, 360 U.S. 252, 257–58 (1959);

---

[3] Because the instant case involved a federal prosecution, the due process guarantees of the Fifth Amendment, not the Fourteenth Amendment, apply. However, "[t]he procedural due process components of the two Amendments are the same." *See Propert v. Dist. of Columbia*, 948 F.2d 1327, 1330 n.5 (D.C. Cir. 1991) (citing *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954)).

- effective assistance of counsel, *see Gideon v. Wainwright*, 372 U.S. 335, 339 (1963); *see also Strickland v. Washington*, 466 U.S. 668, 695–96 (1984); and

- access to a psychiatrist's assistance if sanity is likely to be a factor at trial, *see Ake*, 470 U.S. at 86.

These cases reflect a Constitutional floor, not a ceiling.

Indigent defendants require additional basic tools. Judge Gleeson observed that "[p]ayment for lodging for a defendant who would otherwise be homeless *could* be said to be necessary for 'an adequate representation.'" *United States v. Mendoza*, 734 F. Supp. 2d 281, 286 (E.D.N.Y. 2010) (emphasis added). Judge Gleeson was almost there. With the benefit of additional data, *see supra* (II)(A), this Court revisits his conclusion: it *is* necessary for courts to provide lodging, food, and travel assistance.[4] These basic necessities directly impact three components of the right to a fair trial: the right to be present; the right to participate in one's defense; and the presumption of innocence.

  a. *Right to be present*

Defendants have a right to be present at their own trials. *See United States v. Gordon*, 829 F.2d 119, 123 (D.C. Cir. 1987) (citing *United States v. Gagnon*, 470 U.S. 522 (1985)). This right is "rooted in the confrontation clause of the sixth amendment" and "protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him." *Id.* [A defendant's] presence has a relation . . . to the fulness of his opportunity to defend against the charge." *Id.* (quoting *Gagnon,* 470 U.S. at 526).

---

[4] Courts should inquire prior to trial about a defendant's access to these basic necessities. Courts are accustomed to making such inquiries. For example, in "areas involving fundamental and personal constitutional rights . . . —such as the decision to plead guilty, forego a jury trial, or forego the assistance of counsel—the Supreme Court has required that courts inquire directly of the defendant." *United States v. Ortiz*, 82 F.3d 1066, 1070–71 (D.C. Cir. 1996) (collecting cases).

Indigent defendants who cannot afford to travel to their own trial are deprived of the right to be present just as indigent defendants who cannot afford attorneys are deprived of the right to counsel. As such, the reimbursement of travel costs for trial is necessary. *See, e.g.*, *United States v. Alexander*, No. 3:13-cr-146, 2015 WL 1457975, at *2 (E.D. Tenn. Mar. 30, 2015) (granting travel and subsistence expenses for indigent defendant).[5] Courts have even extended this right to the civil context. For example, in *Tate v. United States*, the court found that a detained plaintiff's presence at a habeas trial was essential. No. 15-cv-9323, 2021 WL 12302293, at *1 (C.D. Cal. Sept. 10, 2021). The court ordered the government to either produce the plaintiff or "pay the travel, meals and lodging expenses" for an attorney to travel to be with the plaintiff and attend remotely. *Id.* The same considerations in *Tate* apply with even greater force to a defendant facing criminal trial. *See Vill. of Hoffman Ests. v. Flipside*, *Hoffman Ests., Inc.*, 455 U.S. 489, 498–99 (1982) (due process requirements are greater in criminal context than civil).

Indigent defendants who cannot afford housing during trial are equally deprived of the right to be present. It is plainly obvious that without a place to sleep, a defendant's ability to attend his trial is functionally moot. Not to mention, "[i]t would be unseemly for our criminal justice system to haul a defendant across the country and require her to live on the street during her criminal

---

[5] 18 U.S.C § 4285 allows judges to order coverage of travel and subsistence expenses for hearings to which "[a defendant's] appearance is required." 18 U.S.C § 4285; *see United States v. Pryer*, No. 21-cr-667, 2023 WL 12135007, at *1 (D.D.C. May 31, 2023) (undersigned ordered the government to pay for travel expenses to return Ms. Pryer to her home in another state and bring her back for a future hearing). However, § 4285 does not authorize the court to require payment for subsistence and housing expenses during trial. *See* Cardone Report at 236–237; *see also Mendoza*, 734 F. Supp. 2d at 284. Because the Court finds that the CJA independently permits costs for subsistence, housing, and clothing, it does not analyze § 4285.

18 U.S.C § 4282 covers an even narrower category of travel and subsistence expenses to return "to the place of his arrest, or, at his election, to the place of his bona fide residence." 18 U.S.C. § 4282; *see also Pryer*, 2023 WL 12135007, at *1. This statute seemingly does not apply to defendants post-conviction who are released pending sentencing.

trial." *Mendoza*, 734 F. Supp. 2d at 283. Ultimately, "it is not consistent with fundamental fairness or due process that an accused defendant, regardless of the crime, be driven to ruin by the expense of attending trial at a place far from his home, nor that he be required to take refuge in jail because of an inability to meet the expense of attending trial." *United States v. Badalamenti*, No. 84-cr-236, 1986 WL 8309 at *2 (S.D.N.Y. Jul. 22, 1986). Accordingly, the provision of housing for indigent defendants is necessary. *See, e.g.*, *Mendoza*, 734 F. Supp. 2d at 283. As Judge Gleeson rightly noted, we "cannot accept that 'the indigent defendant must either rely, for food and shelter, upon the kindness of friends or strangers, or make arrangements through the Pre–Trial Services Agency for lodging in some appropriate facility, such as a half-way house.'" *Id.* at 285 (quoting *United States v. Nave*, 733 F. Supp. 1002, 1003 (D. Md. 1990)).

        b.    *Right to participate in one's defense*

Defendants have a right to participate in their defense. "[A] client's active assistance at trial may be key to an attorney's effective representation of his interests." *United States v. Novaton*, 271 F.3d 968, 1000 (11th Cir. 2001). This right applies equally to indigent defendants. "[J]ustice cannot be equal where, simply as a result of his poverty, a defendant is denied the opportunity to participate meaningfully in a judicial proceeding in which his liberty is at stake." *Ake*, 470 U.S. at 76.

Courts provide free services to safeguard this right. For example, courts mandate the provision of an interpreter for non-English speaking defendants. *See* Thomas M. Fleming, *Right of Accused to Have Evidence or Court Proceedings Interpreted*, 32 A.L.R. 5th 149 at §§ 4–5 (1995) (collecting cases). This is because an interpreter is necessary to protect the accused's "constitutional rights to fundamental fairness and due process of law, including the rights to be present at and participate in the proceedings." *Id.* at § 4[a]. Courts also provide psychiatric evaluations for defendants who may have competency issues. *See Ake*, 470 U.S. at 86. These

8

evaluations ensure that a defendant has the mental acuity to participate during trial. *See id.* Relatedly, courts forbid practices that interfere with this right. For example, the Eleventh Circuit found that ordering a defendant to wear a stun belt during trial was a "considerable impediment to [his] ability to follow the proceedings and take an active interest in the presentation of his case." *United States v. Durham*, 287 F.3d 1297, 1306 (11th Cir. 2002). The court would not allow a condition that so affected the defendant's "focus and attention." *Id.*

"[A] defendant who sleeps on the streets is not going to be fit for a trial the next morning." *Mendoza*, 734 F. Supp. 2d at 286. It is "reasonable to assume that much of a defendant's focus and attention when [lacking food and housing] is occupied by anxiety over [not having them]. A defendant is likely to concentrate on doing everything he can to [get these necessities], and is thus less likely to participate fully in his defense at trial." *Durham*, 287 F.3d at 1306. All of this "may interfere with the defendant's ability to direct his own defense." *Id.*; *see supra* (II)(A) (reviewing impacts of hunger and homelessness).

The distraction that Mr. Adams faced was not merely the hunger from a single missed meal. He had no money to purchase any food during the week-long trial. As noted above, such hunger is a demonstrable distraction that consumes a person's focus and attention.

Additionally, lacking housing "can interfere with a defendant's ability to participate in his own defense, say, by freely choosing whether to take the witness stand on his own behalf." *Deck v. Missouri*, 544 U.S. 622, 631 (2005). Homeless defendants are understandably afraid to draw attention to themselves, but attention is unavoidable when a witness takes the stand. *See* Varsha Eswara Murthy et al., *Self and rules in a sample of adults experiencing homelessness: Relationships to shame, well-being, and psychological inflexibility*, 21 J. CONTEXTUAL BEHAVIORAL SCI. 88, 88 (2021), available at https://perma.cc/U4WZ-GRFP (last accessed Sept.

23, 2025) ("Empirical research demonstrates that people experiencing homelessness report a devalued sense of self, diminished sense of identity, low self-worth, and low perceived self-efficacy which detrimentally impacts well-being."). This was more than a theoretical concern here: with the benefit of food and housing, Mr. Adams testified on his own behalf.[6]

Ultimately, "[p]resence at trial is meaningless if the defendant is unable to follow proceedings or participate in his own defense . . . [D]espite the defendant's physical presence in the courtroom, fear [and physical pain from lacking food and housing] may eviscerate the defendant's ability to take an active role in his own defense." *Durham*, 287 F.3d at 1306 n.7. Thus, as with interpreters and psychiatric evaluations, courts must provide housing and food for indigent defendants.

      c.    *Presumption of innocence*

The presumption of innocence "is a basic component of a fair trial." *Estelle*, 425 U.S. at 503. Over a century ago, the Supreme Court declared that "[t]he principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." *Coffin v. United States*, 156 U.S. 432, 453 (1895).

---

[6] The plight of homeless and hungry pro se defendants is even more acute. "A criminal defendant has a constitutional and statutory right to waive counsel and represent himself." *United States v. Tucker*, 451 F.3d 1176, 1180 (10th Cir. 2006) (citing *Faretta v. California*, 422 U.S. 806, 834–36 (1975)). "This right includes the right to control one's own defense, 'to make motions, to argue points of law, to participate in voir dire, to question witnesses, and to address the court and the jury at appropriate points in the trial.'" *Tucker*, 451 F.3d at 1180 (quoting *McKaskle v. Wiggins*, 465 U.S. 168, 174 (1984)). A defendant cannot effectively engage in these demanding tasks without access to food and shelter. *See supra* (II)(A). "When a defendant properly invokes the right to self-representation, the denial of any one of those elements is a denial of the right to self-representation. Deprivation of the right to self-representation requires automatic reversal because the impact of 'its denial is not amenable to "harmless error" analysis.'" *Tucker*, 451 F.3d at 1180 (quoting *McKaskle*, 465 U.S. at 177 n.8).

"[C]ourts must carefully guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt." *Estelle*, 425 U.S. at 503 (citing *In re Winship*, 397 U.S. 358, 364 (1970)). Though the impact of certain factors on a jury's decision-making process "cannot always be fully determined . . . the probability of deleterious effects on fundamental rights calls for close judicial scrutiny." *Id.* at 504 (citing *Estes v. Texas*, 381 U.S. 532 (1965); *In re Murchison*, 349 U.S. 133 (1955)). Even "the *possible* impairment of the presumption [of innocence]" requires court intervention. *Estelle*, 425 U.S. at 504 (emphasis added).

For example, the Supreme Court held in *Estelle* that a detained defendant should have access to civilian clothes—as opposed to jail uniforms—at trial. *Id.* at 510. For detained indigent defendants, courts can provide funds to purchase such clothing. *See e.g.*, *Felts v. Estelle*, 875 F.2d 785, 786–87 (9th Cir. 1989) ("[T]he state is under an affirmative duty to provide civilian clothing in a timely fashion and, if no such clothing is in its possession, to provide reasonable funds for the purchase of acceptable attire."). This is because "an accused who is forced to stand trial in prison garb because of financial inability to obtain other attire is under a compulsion equal to that of the prisoner who is not allowed to don readily available civilian attire." *Bentley v. Crist*, 469 F.2d 854, 856 (9th Cir. 1972).

Similarly, courts require the provision of hygiene products to incarcerated defendants at trial. For example, the D.C. jail guarantees access to hygiene products at all times. *See* D.C. Department of Corrections Policy and Procedure No. 4010.2H (13)(a), (b). Additionally, courts can order the D.C. jail to provide residents with "hair styling or a haircut/shave before a court appearance." *Id.* at (14)(b)(2). Similar provisions bind other carceral facilities. *See, e.g.*, Hanna Kozlowska, *Federal prisons are finally required to provide women inmates with free tampons and*

11

*pads*, QUARTZ (Jul. 20, 2022), https://perma.cc/2R2P-7M46 (The Bureau of Prisons must ensure that incarcerated people have access to feminine hygiene products for free).

Homelessness also presents "an unacceptable risk . . . of impermissible factors coming into play," which dilute the presumption of innocence.[7] *Estelle*, 425 U.S. at 504-05. Biases against homeless people tend to be potent and unforgiving. "People experiencing homelessness are perceived as the lowest of the low social group, and elicit extreme emotional prejudice in our society." Nuoya Tan and Lasana T. Harris, *The Neuroscience Underlying Dehumanised Perception Towards People Who Are Homeless*, *in* REPRESENTING HOMELESSNESS, 24–43 (2021), available at https://perma.cc/UTH6-WK8Q (last accessed Sept. 23, 2025). And homeless defendants likely lack access to a shower and hygiene products. Jessica H. Leibler et al., *Personal Hygiene Practices among Urban Homeless Persons in Boston, MA*, INT'L J. ENV'TAL RSCH. AND PUB. HEALTH 14, 928 (2017), available at https://perma.cc/9ZGL-HHYT (last accessed Sept. 23, 2025) (finding that sleeping outdoors was a key risk factor for reduced access to hygiene facilities). Without these basic necessities, the stigmas of homelessness will follow indigent defendants into the courtroom. Non-incarcerated defendants deserve the same court-ordered housing and hygiene benefits that incarcerated defendants receive during trial.

    d.    *Other considerations*

Finally, "judges must seek to maintain a judicial process that is a dignified process. The courtroom's formal dignity, which includes the respectful treatment of defendants, reflects the

---

[7] As part of the court's charge to make trials fair, it must attempt to root out jurors' biases. *See, e.g.*, *Peña-Rodriguez v. Colorado*, 580 U.S. 206, 209 (2017). Countless biases (e.g., race, gender, weight, attractiveness, etc.) can negatively impact a juror's perception of a defendant. Courts cannot address every one of these. Instead, courts must focus on biases that can reasonably be identified and mitigated. There is no difficulty doing so here. The bias that arises from a defendant presenting in court as homeless is demonstrable. And unlike other biases, mitigating homelessness is a straightforward undertaking: pay for housing. This remedy has already proven successful. *See Mendoza*, 734 F. Supp. 2d at 283.

importance of the matter at issue, guilt or innocence, and the gravity with which Americans consider any deprivation of an individual's liberty through criminal punishment. And it reflects a seriousness of purpose that helps to explain the judicial system's power to inspire the confidence and to affect the behavior of a general public whose demands for justice our courts seek to serve." *Deck*, 544 U.S. at 631.

In *Illinois v. Allen*, the Supreme Court found the presence of shackles on a defendant posed "an affront to the . . . dignity and decorum of judicial proceedings." 397 U.S. 337, 344 (1970). "Shackles are a minor threat to the dignity of the courtroom when compared with" the harms from homelessness and hunger: mental breakdowns, being the victim of physical violence, an inability to think from hunger pangs, serious illness, and more. *See Durham*, 287 F.3d at 1306; *supra* (II)(A). Indeed, homeless, starved defendants "have the potential to be highly detrimental to the dignified administration of criminal justice." *Durham*, 287 F.3d at 1306. No different than by removing physical shackles or a stun belt, courts must remedy the risk of indignity to the courtroom by providing food and housing to indigent defendants. For that reason, the Court did so here.

C. The CJA

In 1964, responding to the Supreme Court's decision in *Gideon*, Congress enacted the CJA "[t]o promote the cause of criminal justice by providing for the representation of defendants who are financially unable to obtain an adequate defense in criminal cases in the courts of the United States." Pub.L. 88–455, 78 Stat. 552 (codified as amended at 18 U.S.C. § 3006A). The CJA directs United States district courts to furnish legal representation to defendants who cannot afford it and specifies that "[r]epresentation *shall* include counsel and investigative, expert, *and other services necessary for adequate representation*." 18 U.S.C. §3006A(a) (emphasis added).

Some commentators have noted a perceived lack of authority for the provision of CJA funds for housing, subsistence, hygiene products, and travel for defendants during trial. *See, e.g.*,

13

The 2017 Report of the Ad Hoc Committee to Review the Criminal Justice Act § 12.1 (2017) (hereinafter "Cardone Report"). The Cardone Report suggests that the CJA cannot be used to reimburse such costs because Volume 7A of Judiciary Policy "prohibits the use of CJA funds for 'cost of services of a personal nature and expenses incident thereto.'" *See* Cardone Report at 237, n.1097 (citing Guide to Judiciary Policy, Vol. 7A, § 230.66.20). The Policy specifically carves out "purchasing new clothing" and "furnishing . . . meals" for clients as non-reimbursable expenses. *See* Guide to Judiciary Policy, Vol. 7A § 230.66.20(a).

This Court will not apply this thoughtless and inhumane edict from the Judiciary Policy. First, "the Guide is not binding"—it is entitled only to "respectful consideration." *See United States v. Al-Marimi*, 761 F. Supp. 3d 16, 25 (D.D.C. 2024) (quoting *Hollingsworth v. Perry*, 558 U.S. 183, 193 (2010)). Second, the Judiciary Policy's categorical prohibition of the use of CJA funds for "items of a personal nature"—including the cost of housing and meals—is at odds with the text of the CJA. And "[a] valid statute always prevails over a conflicting regulation," let alone Judiciary Policy. *Nat'l Fam. Plan. & Reprod. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 829 (D.C. Cir. 2006).

It is "well settled that the starting point for interpreting a statute is the language of the statute itself." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 56 (1987) (quoting *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980)). Thus, the Court begins its analysis by examining the plain language of the CJA. The relevant portion of the CJA directs courts to provide costs for "other services necessary." 18 U.S. Code § 3006A(a). The statute does not define these terms. Courts give undefined terms their "ordinary meaning." *Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 566 (2012). Dictionaries in use at the time of a law's passage may provide that ordinary meaning. *See id.* at 566–69.

Dictionary definitions of "other," "services," and "necessary" at the time of the CJA's enactment are as follows. "Other" meant "ones distinct from those first mentioned." *Other*, *Webster's Seventh New Collegiate Dictionary*, G. & C. Merriam Co. (1963) (hereinafter "Webster's Seventh"). Definitions of "service" focused on benefiting or meeting the needs of people. *See Service*, Webster's Seventh (defining "service" as "help" or "benefit" or "contribution to the welfare of others"); *see also Service*, Webster's *Third New Int'l Dictionary of the English Language Unabridged*, G. & C. Merriam Co. (1961) (hereinafter "Webster's Third") (defining "service" as "an act done for the benefit or at the command of another" or "meet the needs of").

Finally, dictionaries provided a common thread in defining "necessary." Many dictionaries provided definitions both in terms of substantive items as well as descriptions of items that were considered "necessary." Webster's Seventh, for instance, defined necessary both as "an indispensable item: essential; *specif[ically]*: money" or something "that cannot be denied without contradiction" or "of fundamental importance." *Necessary*, Webster's Seventh. Similarly, Webster's Third defined "necessary" as "items (as of food, clothing, shelter, medical care, equipment or furnishing) that cannot be done without: things that must be had (as for the preservation and reasonable enjoyment of life): essentials." In its adjectival form, something that was "necessary" was "of, relating to, or having the character of something that is logically required or logically inevitable or that cannot be denied without involving a contradiction." *Necessary*, Webster's Third. Both definitions provided that items that were necessary could not be done without. Thus, "necessary" items included money, food, clothing, shelter, and even medical care.

Taken together, the ordinary meanings of "other," "services," and "necessary" at the time of the CJA's enactment demand reading the statute as requiring the provision of food, lodging, and travel assistance for indigent defendants. Each of these items is unenumerated—bringing them into

15

the definition of "other." Further, food and shelter are outright listed as examples of "necessary" items in Webster's Third. And the emphasis of dictionary definitions of "service" on providing a benefit to help or meet the needs of others lends additional support to this Court's interpretation. *See Mendoza*, 734 F. Supp. 2d at 286 ("Construed broadly, the term 'other services' might be read to include lodging for a defendant during trial."). Indeed, "[p]ayment for [travel, food, and] lodging for a defendant who would otherwise be homeless could be said to be necessary 'for an adequate representation[.]'" *Id.* On that basis, the court in *Mendoza* allocated CJA funds toward the defendant's "modestly-priced hotel for the duration of the trial." *Id.*

If plain meaning is not enough, looking to the whole statute further supports this interpretation. "Statutory construction . . . is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988). First, food, shelter, and travel assistance are basic tools necessary for an adequate defense. *See supra* at (II)(A). And the CJA mandates the provision of basic tools for an adequate defense. *See generally*, 18 U.S.C. § 3006A. Second, other provisions within the CJA support reading "and other services necessary for adequate representation" more broadly than the Judiciary Policy recommends. For example, within a sub-section entitled "Disclosure of fees," Congress enumerated *twelve* different categories of expenditures meant to be covered by the Act, including, but not limited to, "[t]rial and appeals," and "[o]ther" expenses. *See* 18 U.S.C. § 3006A(d)(4)(B)(ii)(I)–(XII). Enumerating trial expenses and then adding a broad category of other expenses demonstrates that Congress intended for the CJA to pay for an indigent defendant's necessities at trial.

As another example, an entire sub-section of the CJA, entitled "Services Other Than Counsel," provides funding for "investigative, expert, or other services necessary for adequate

16

representation." *See* 18 U.S.C. § 3006A(e)(1)–(2). This sub-section gives courts latitude to, "in the interest of justice . . . approve payment for such services" other than counsel without prior request. *See* 18 U.S.C. § 3006A(e)(2)(B). The interest of justice demanded that Mr. Adams receive housing, food, and travel expenses. Courts would not permit jails to deprive incarcerated defendants of food, shelter, and transportation to court, particularly during trial. The same must be true for non-incarcerated defendants. Thus, the Judiciary Policy impermissibly limits judges' ability to provide access to "other services necessary for adequate representation." 18 U.S.C. § 3006A(e)(1)–(2).

Moreover, the CJA specifically directs courts to consider the following in making funding determinations: (1) the "5th amendment right against self-incrimination"; (2) the "6th amendment right to effective assistance of counsel"; (3) "the safety of any person"; and (4) "any other interest that justice may require." *See* 18 U.S.C. § 3006A(d)(4)(D)(i)–(vi). Each of these considerations supports the Court's decision to reimburse costs associated with food, housing, and travel. *See supra* (II)(A).

### III.  CONCLUSION

Poor defendants are not characters in Oliver Twist meant to beg the courts: Your Honor, I want some more [basic necessities], please.

Date: September 24, 2025

                                            ZIA M. FARUQUI
                                            UNITED STATES MAGISTRATE JUDGE